Mr. Harmon? Yes, Joan. Good morning. Good morning. How are you? Okay. How are you, Joan? Fine, thank you. Welcome. Joan, there's a threshold issue in this matter brought up by the government that was not addressed in my brief. I responded to the court's order to prepare a supplemental brief on the issue of whether or not 2D1.112B applied – facts in this case. The threshold issue was that Ms. Clark, who represented herself, failed to object to the application of that section at the time that – before sentencing. And that because she failed to object before sentencing to that application, that she waived her right to challenge this issue on appeal. Now, I looked into this a little further. And I noticed that, in fact, if you look at the supplemental joint appendix on page 16, it's the resolved and unresolved objections. This is the addendum to the pre-sentence report filed by the probation officer. And I noted under unresolved objections, it states that the defendant advised that she objects to, and she notes paragraph 6 through 25 of the pre-sentence report. She doesn't object to the remainder of the pre-sentence report. And it's interesting that in the pre-sentence report, paragraph 27 on page 468 of the joint appendix indicates the role and the offense. That's the particular paragraph in the pre-sentence report that she would have – well, would have been required to object to actually keep – well, I should say, retain her right to appeal this matter. She actually didn't actually raise it, or at least the probation. So we just have a plain error review here, is that right? Yeah, it's a plain error review. That's the point I'm trying to get to. And I just wanted to get that bias because I realize that's where we are. So I'll just argue from that point on. It's plain error because it does meet the – I mean, identify the error, actually. It is the application of the guidelines. It actually increases her guideline range from 235 months. You challenge the sufficiency of the evidence to support the two-level enhancement for maintaining a drug-related premise. Right. And you're doing so on plain error review. On plain error review because the plain error, the substantial right that is affected is, in fact, that if she had prevailed on this, if she had properly objected to it and prevailed on this issue, her sentencing guidelines would have been – a range would have been 188 to 235 months in imprisonment as opposed to 235 to 293 months imprisonment. So it did affect her substantial rights. So I'll just move on from that issue. Now, the issue here is – and this application, at least by commentary, is fact-sensitive. I mean, commentary states you look to the facts of the case because there's not going to be a one-size-fits-all when you're dealing with this section. You'd have to look at, oh, these cases are different. Tell us why it's a plain error here. Why is it an error? Something that in this circumstance has to be not subject to reasonable dispute. Based on these facts, why is there a plain error? Because Ms. Clark – the facts in this case do not demonstrate that Ms. Clark had either a possessory interest. She didn't rent and she didn't own this apartment. And the control access – That's not a required factor, ownership or leasehold rights. It's one of – it's not a required factor. It's one of the factors the court considers. It's just one of many factors. And then the court does – I mean, not the court. The guidelines doesn't lay out all the factors because it could be almost infinite. But that's one of the four factors stated in the guidelines. She did come and go to this stash house pretty much whenever she wanted to, didn't she? Stayed there when she wanted to? No. I can't answer that question in a few minutes. She went to this particular apartment to either drop off or take away drugs or money. That was her job. Basically, Ms. Clark was a carrier of drugs or money from proceeds of drug sales. That's her job in this conspiracy. She just basically transported cocaine or heroin from Atlanta, Georgia to Virginia. Any evidence indicating that she had a lawful purpose for being at the apartment at any time? Sleeping, using the restroom. I thought about that. Those are lawful purposes. One would hope. Yeah, one would hope. Now, the government makes an issue about joint possession of the possessory interest in this apartment and also makes an issue about extended stay in the apartment because there's some testimony in this case about from co-defendants – well, I should say from unindicted co-conspirators that Ms. Clark had stayed there overnight and sometimes for extended periods. I'm sorry. I'm sorry. I was looking at the record at J193. It appears that after Freeman was arrested, they – which presumably means Clark and Joseph – would remain at the apartment for extended periods. Well, that's what I understand. And the problem I have with the term extended is are we talking about a day, two days, a week, months? It's not clear. So I don't think that's going to be a strong point that the government can raise because that wasn't really – the witnesses – I think it was two witnesses that testified to an extended stay. Based on the record, I don't know what that meant. I really don't know what extended stay meant. I know she stayed overnight. That was clearly stated in the record because it was said more than one time, and overnight means overnight. We know what that means, but I don't know what extended stay means. It could have meant that she stayed an extra day. Now, I also take offense to the government saying that she extended her stay or at least waited at times for the purpose of allowing one of the unindicted co-conspirators to sell the drugs. And that was the sole purpose of her staying there in the apartment. And then she would leave. What the evidence was is that she just stayed. I think that's stretching the facts a little bit that that was her sole purpose because there was really no testimony that she even admitted that or – that she had admitted that that was her sole purpose for staying in the apartment, the extended stay, so to speak. Do you have a sort of colloquially a de facto possessory interest in the apartment by virtue of – I think the evidence showed that she possessed and at some points carried a firearm while she was there. Well, she – I think – see, the facts in the case – when I looked at the facts, it appears that there was a firearm in the apartment. Nobody testified that they saw her with a firearm in the apartment. There was testimony that there was a drug sale outside of this apartment situation where one of the unindicted co-conspirators said at the time of the sale, he witnessed Ms. Clark in possession of a firearm. But I don't think the testimony was that when they went to the – they just observed a firearm in the apartment. And I'd like to point out that – She had access to the firearm? Arguably constructed. Well, wouldn't that lend itself to having more of a possessory interest in it? I think if we had more facts, I could answer that question. But I – on the facts of this case, I can't tell because there was really no elaboration on where this firearm was in the apartment, which room, whether it was in the kitchen or in someone's bedroom or near a drawer. I really don't know. Or a control. If there was a firearm present and she had access to it, would it give her more control over the premises? If she had more access to it. But then that's – again, like I said, the facts are not clear on that particular issue. I don't know if she had that kind of access. Another issue is, I mean, I was looking for something in a case like this is whether she had a key. I looked for that as well. Yeah. I didn't see any evidence of that. And even the government's brief concedes that no one testified that she personally took the drugs up to the apartment when she drove the Yukon to Virginia. Well, there wasn't any dispute that she was taught, for instance, how to stretch cocaine in the apartment. There really isn't any dispute about her being in the apartment with drugs and drug money. I'll concede on that point because I think that was testified to a couple of times that she asked one of the unidentified how to stretch cocaine. And she repeatedly asked that. And that occurred in the apartment. So I think with respect to the apartment, that's probably one of the things that's not helpful to Ms. Clark's case, that constant questioning about when are you going to teach me how to stretch the cocaine. That's all I see. And sleeping in the apartment or staying there, that's the only two things that really connect her to this particular apartment. Do you have any authority that outlines when control does or does not exist? I mentioned a couple of cases. But I think control or dominion is probably what we would refer to it in the ordinary sense of the term, especially something like an apartment. People, I think, just everyday meaning of the term control means someone who that's their apartment. Either they lease it or they own it. They have a key to it. That's the person that can tell you you can come and go, tell you you can enter or tell you you have to leave. Someone in that position would have control or dominion over the particular apartment or leasehold or whatever it is. And I don't – there's no evidence that she had such control. It's just all we have is that she stayed there overnight and she asked someone to teach her how to stretch cocaine. I'm sorry, Your Honor. The question, as you see it, that whether or not she had control in some sense over the apartment, is it ambiguous under the evidence or do you conclude that it is clear she did not have control? I would take the position that it's clear that she did not have control. At best, Ms. Clark was just a visitor, someone who just stayed there. There was drug activity going on there. When she was ready to do what she was assigned to do, that's what she did. She took the money or she took the drugs. She got back in the Yukon. She drove back to Atlanta. Because if you notice in the facts, it indicated that her and the co-defendant, Joseph, they were home-based in Atlanta, Georgia, not in Virginia. There's no testimony that they were home-based here in Virginia. She's an out-of-stater, so to speak. There's a little more. It's not quite as innocent as that. She would bring the drugs north from Atlanta to Freeman at the apartment, and she would stay at the apartment while Freeman sold the drugs. She wasn't there for recreational purposes. She was there because that's where she stayed while the drug transactions were being carried out. And when the money came back, she would drive back to Atlanta. Aren't those the facts that we have? Somewhat, Your Honor. I'm confused because I don't know if she stayed at the apartment every time she made a drop-off of drugs in Virginia. Was it every time she came up to Virginia? There was a lot of instances which she brought drugs or either money, I guess it's really the drugs to Virginia or money to Atlanta. Did she stay in that apartment each and every time she came to Virginia? Do you think that matters? I do to a certain extent because it shows dominion. It shows control, access, things of that nature, as opposed to someone. Because the reason why, because, Your Honor, it shows a pattern that this is a place where she goes and she can stay. And if it can be argued that she's doing this every time she goes up, then, yes, she probably does kind of stay there part-time. But if she's just doing this when it's convenient or when it's inconvenient, because Freeman or Leary or Lee have been sold the drugs by the time she's ready to leave and take the money back, then. . . Dissociating and abetting and maintaining a drug-related premises. That's the argument that the government's making, and I disagree with that argument. I think that's stretching a little. Because if that was the case, then the probation officer's job would be very easy. She can apply the 2D1.1B12 to everybody in the conspiracy, if that's the case. At least any co-conspirator that stepped into an apartment or a drug-related premise. That would be applicable, then. Her job would be or his job would be easy to apply that enhancement. So I don't think that that's necessarily so. You've reserved some time for rebuttal. Oh, I'm out of time. I'm sorry, Your Honor. Thank you. Okay, thank you, too. Mr. Mitchell. Yes, Your Honor, may it please the Court, my name's Darrell Mitchell. I represented the government at every stage of these proceedings in the district court. I would first point out the fact that the defendant in this case, Ms. Clark, was far more than just a transporter. She was a street corner heroin dealer. Mr. Joseph McPherson testified to that during the trial in this case, and his testimony concerning her possession of heroin on three separate occasions with the intent to distribute supported her conviction on three counts of possession of heroin with the intent to distribute. So my point is that she was more than a transporter. Okay. Is that relevant to the enhancement? Well, I simply wanted to point out, I don't think it is directly relevant to the enhancement because there's no evidence that on those particular occasions her possession with intent to distribute occurred at the apartment. But I just simply wanted to point out that she was more than simply a mere transporter of narcotics. Since counsel agrees that the error here would have to be plain error, I simply do to concur with Judge Agee's comments. For the error to qualify as plain under the second prong of plain error, the error must be clear or obvious. The district court's ruling must have violated settled law. Whether there was an error cannot be subject to reasonable dispute, and that's simply not the case that we have here. First of all, this apartment was not used for any legitimate purpose. This isn't the case that we see in many of the published decisions. The court has to distinguish between a residence that is used for some lawful purposes and for some unlawful purposes relating to drug trafficking. No one resided at this apartment. This apartment was exclusively a warehouse that was used to store money and drug proceeds for this small nucleus of co-conspirators in this conspiracy of which Ms. Clark was a part. But someone was a tenant. Someone paid the rent. Someone paid utility bills. It was very hazy as to whether Ms. Clark left belongings in the apartment. There's no record of evidence of record that she had a key. There are a lot of pieces that it doesn't seem to me that we know. And that's, of course, because she didn't object to this prior to her sentencing. We have only the trial record to support the enhancement in this case. And, of course, there are many non-essential facts relating to the elements of the offenses for which she was on trial that would not have been presented during the course of her trial because they weren't particularly relevant in proving the case against her. And because she didn't object to this enhancement, the district court was not called upon to conduct any additional fact-finding. So the haziness, I would suggest, is as a result of the defendant's failure to object to the application of this enhancement in her sentencing. What evidence did y'all have at trial that she had control of the premises? What was her role in the control of the premises? Well, in addition to the fact that she routinely transported very large quantities of drugs which were stored at this apartment, and, of course, the court attributed her with a total of 48.5 kilograms of cocaine and 8.3 kilograms of heroin, all of which was at some point stored in this residence. In addition to the fact that she transported that cocaine to Mr. Freeman at that apartment, she remained at the apartment exclusively to permit him the additional time to distribute the cocaine and heroin from her previous transport. She didn't remain in town, as Judge Duncan indicated. She wasn't there as a tourist. She slept and used the restroom because she was waiting for Mr. Freeman to finish the drug sales from the previous load of cocaine and heroin that she had delivered on the prior occasion so that she could transport all of the group's proceeds back to Atlanta. The drugs and the money were stored in the residence, in her presence, and I think that's vital to the court's determination here. She did not, she didn't, she had a possessory interest in common with that of her co-conspirators, and she, along with two other co-conspirators, controlled access to or activities at the premises. There were valuable quantities of drugs stored at the apartment and there were large sums of money, and certainly only trusted members of the conspiracy would have access to the entire apartment while those items were present. But does the record give us any basis to determine the quantity of time that she spent there, particularly how many nights did she stay there after Freeman was arrested? How did she get in and out? What was her ability to control the apartment after that happened? Other than knowing generically that those happened, can we quantify it in any way? Not with any great certainty, I must concede. Mr. Freeman, before Mr. Freeman was arrested, he testified at her trial, having pled guilty and agreeing to cooperate with the government. He testified that prior to his arrest, that she, upon delivering drugs to the apartment, she would remain there, he said, not just overnight, but sometimes for multiple days, for extended periods, until he finished selling all of the drugs from the previous shipment. So it's clear that she remained there more than one or two nights, or at least more than one night, and her exclusive purpose in remaining in town, because the record establishes that she was an Atlanta resident, and that's where the drugs distributed by this organization came from. The record establishes that she was an Atlanta resident. She remained in town for the exclusive purpose of allowing Mr. Freeman to sell out his previous shipment of drugs so that she could transport back to Atlanta the full sum of money. And I think what I've neglected up until now is that not only did she make use of the residence, but she also directed the activities that occurred within the apartment. She, on multiple occasions, according to Dedrick Leary, who testified in the case, directed Mr. Leary, in the apartment, along with an unindicted co-conspirator who went by the nickname Flaps, she and Mr. Flaps, on multiple occasions, according to Mr. Leary's testimony, directed him to stretch drugs. And on one occasion, she, after receiving payment for having transported two kilograms of cocaine to the apartment, in Mr. Leary's presence, she received four ounces of cocaine as payment from this co-conspirator Flaps, and she asked Mr. Leary, on this particular occasion, to stretch her four ounces. So on multiple occasions, she and Mr. Flaps directed Mr. Leary to stretch drugs, the drugs that she had delivered to the apartment, and on one particular occasion, she received drugs as payment in his presence and asked him to further dilute those drugs to maximize the profitability from the drug sales. Is there any evidence as to who leased the apartment and or whose name the utilities were in and who may or may not have received any mail? Well, there was no evidence as to utilities or mail, but there was evidence adduced at trial from the testimony of Diedrich Leary. He indicated that he knew a woman who rented this apartment in Ocean View, and she moved out of the apartment and she allowed Mr. Leary and his associate, Demetrius Lee, to take possession of the apartment. He testified that he continued to pay rent on the apartment to her, the leaseholder, for approximately a year. So Mr. Leary, at least initially from 2012 to 2013, paid the rent to the true leaseholder. Did Ms. Clark contribute in any way to Mr. Leary for purposes of any of these? Well, she delivered the group's drugs to the apartment. Mr. Leary was a drug trafficker. He was a drug dealer. She delivered the group's drugs to the apartment, which permitted the group to distribute the drugs and generate the income necessary to pay the rent. After Mr. Leary informed Quincy Freeman, his drug supplier, about the apartment, Mr. Freeman moved into the apartment and began, and I don't mean to suggest that he resided in the apartment. Testimony adduced at trial indicated that he resided with his girlfriend at another location. But he, once Mr. Freeman learned from Mr. Leary about the availability of the apartment, Mr. Freeman made use of the apartment on behalf of the organization for the purpose of storing and distributing narcotics as well as storing drug proceeds. Mr. Freeman occupied the apartment on behalf of the organization for a substantial period of time until his arrest. But the honest leaseholder was a woman who was described in the testimony of Mr. Leary, but there was no testimony beyond the origins of his contact with the apartment. There was no testimony adduced at trial concerning the utilities or the other subject that Your Honor mentioned. A lot of the cases that I looked at involving, well, maybe not a lot because there aren't a lot, but the cases that I looked at involving this enhancement tended to involve portions of a person's home, and whether or not a garage or an attic or some space within the home could be maintained. But in that instance, ownership is clear. And then in other cases, the enhancement looks at whether or not the person pays the rent. Here we have at best an inferential process that says that Ms. Clark was involved in generating profit, and the profit contributed to the payment of the rent. Therefore, indirectly, Ms. Clark contributed to the payment of the rent. It's the most attenuated fact pattern that I have seen. Is that an unfair characterization? Well, my first response is that those cases where the residence is used as both a, where the premises is used as both a residence and as a place for distributing drugs, in many ways that's a closer call because the government would have to establish that the drug distribution is one of the principal uses for the premises. Here, there's no question that the drug trafficking, if not the principal, is the exclusive use of the residence because there's no testimony that anybody in particular lived there. And that's correct. But my question sort of goes to whether or not Clark maintained the premises. Well, it is somewhat inferential. The record clearly establishes that she was a transporter for the group, that she remained in town in Norfolk while Mr. Freeman continued to sell drugs. In the presence of large quantities of drugs as well as cash, that she directed others to stretch drugs in the apartment. But I would suggest that it's not uncommon in a drug enterprise that people like Ms. Clark have somewhat segmented roles, and her role was primarily as a transporter. But nevertheless, she was one of just two or three co-conspirators who had full access to this apartment. But just in terms of maintaining, yes, it's a somewhat inferential argument that she, by performing her duties as a transporter, that she provided the drugs that were sold in Norfolk such that profits could be generated, such that the rent could be paid. Is there any question that anybody else had a key? The testimony adduced at trial concerning the narrow group of people who had the ability to come and go from the apartment, that included Ms. Clark, it included Quincy Freeman, it included a co-conspirator who went by the nickname Flaps, and there was no testimony that anybody other had full access to the apartment. With respect to a key, there was no specific testimony concerning the possession of a key by any of the co-conspirators. And again, I would suggest that that's because the record here is trial testimony, and that simply wasn't particularly relevant to any of the elements for the four charges for which Ms. Clark was on trial. Thank you very much. Thank you. Mr. Harmon? I would just like to point out, the government had mentioned that during the trial that there was testimony that Ms. Clark directed a co-defendant, an under-dieted co-defendant to stretch the cocaine. I just checked the transcripts, and on page 189, I'll start off at line 9. Answer, yeah, I was showing Flaps how to mix the cocaine and stretch it out. She came into the room and questioned Defendant Clark. Answer, yes. She had came into the room, and he was telling her, well, this is for the trip. And then she asked me to show her how to process with the four ounces he had given her. Show her the process. I'm sorry, show her the process. So what I'm trying to point out there is that there is no direction. Ms. Clark was a carrier. She was in no position to be telling them what to do in that apartment. She was asking how to perform the process of stretching. I don't know why she asked that question, but maybe she was trying to stretch what she was receiving in payment for transporting the drugs. But it was not in a sense where she was in control in directing them. Where she was telling him what to do. Right, exactly. Because if that's the angle we're going at, then it could show some control. Well, you can infer some kind of control with the apartment and the people in the apartments. And I'm just trying to distinguish that. But she was just asking, not telling. Undyne Colkins for how to stretch. So I just wanted to point that out. And also, Judge Agee, with respect to the plain error aspect, I think I pointed out that we have identified the error. It's the 2B1.1B12 error. It's plain because it's obvious that if it had not been applied, she would not have received the enhancement. It affects a substantial right because she did receive the enhancement. And the fourth prong, would it seriously affect fairness and integrity of public reputation in judicial proceedings? Yes, because then people are going around, well, why did you receive the enhancement and I didn't? And on the same facts. So it does. It would cause a problem with the fourth prong if this occurred and it wasn't corrected. So that's all I have, Your Honor. Thank you very much. Sorry. Any questions? Okay. Thank you, Your Honor, again. Thank you very much. We'll ask the clerk to adjourn court for the day and we'll come down in group council. This honorable court stands adjourned until tomorrow morning at 930. God save the United States and this honorable court.
judges: Allyson K. Duncan, G. Steven Agee, Bruce H. Hendricks